[Cite as *State v. Miller*, 2024-Ohio-4994.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | |
| THOMAS MILLER | : | Case No. 2024-CA-0033 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:    Appeal from the Municipal Court,
Case No. 23TRC06843


JUDGMENT:    Affirmed


DATE OF JUDGMENT:    October 16, 2024


APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

MICHAEL S. COX, JR.                       CHRIS BRIGDON
40 West Main Street                       8138 Somerset Road
Newark, OH  43055                         Thornville, OH  43076

*King, J.*

{¶ 1}   Defendant-Appellant Thomas Miller appeals the February 15, 2024 Judgment of the Licking County Municipal Court. Plaintiff-Appellee is the State of Ohio. We affirm the trial court.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   On August 19, 2023, at approximately 11:15 p.m., Ohio State Highway Patrol Sergeant Joshua Carte was on routine patrol when he noticed a 2014 Lexus driven by Miller, and traveling from an area of drinking establishments. Carte observed Miller's driving behavior as Miller approached a stop sign. He watched Miller stop on top of the stop bar instead of behind it, well into the crosswalk and intersection. Miller then failed to signal for his left-hand turn. Transcript of trial (T.), 92-97.

{¶ 3}   Based on these observations Carte activated his cruiser's overhead lights. Despite having several opportunities to pull over, a lack of any other traffic and low speed travel, Miller failed to pull over for 23 seconds. Carte observed Miller was riding his brakes and when Miller did stop, the car jerked to a stop instead of coming to a smooth stop. T. 97-98, 138.

{¶ 4}   Upon approaching Miller, Carte noted a strong odor of alcohol coming from Miller's vehicle. Carte advised Miller he pulled him over for failing to stop behind the stop bar and cross walk. Miller acted irritated and denied the traffic infraction. T. 100. Carte noted Miller's eyes were bloodshot and glassy and that it took him a good deal of time to find his proof of insurance on his phone. Asked why it took him so long to stop, Miller claimed it only took him 10 seconds to stop. Miller stated the car belonged to his wife and further advised that he was going through a divorce. Carte suspected Miller was

attempting to elicit sympathy with this last piece of unnecessary information. Asked if he had anything to drink, Miller stated he had two beers. T. 101-102, 104.

{¶ 5} In order to determine whether the odor of alcohol was coming from the vehicle or Miller, Carte asked Miller to step out of the Lexus and stand in front of his cruiser. Once out of the car, Carte continued to detect a strong odor of alcohol on Miller's breath. Carte noted no mobility issues when Miller got out of the car and walked to the cruiser, and Miller complained of none. T. 103-104.

{¶ 6} Based on his observations, Carte elected to continue his investigation by administering field sobriety tests. Before doing so, Carte asked Miller questions required for medical assessment before administering the tests. Instead of answering the questions, Miller first became agitated, stated he had done nothing wrong, and brought up his divorce again. He then stated he had "blown" and "obliterated" disks in his neck and back. He denied taking any prescription medications or drugs. T. 106, State's exhibit 1.

{¶ 7} Carte began with the horizontal gaze nystagmus (HGN) test. Before beginning, he first checked Miller's pupils which he found to be of equal size, checked to make sure Miller could properly track left and right, and further noted no resting nystagmus. Upon administering the HGN test, however, Carte noted six of six possible clues indicating impairment. T. 108-112. Before deciding to arrest Miller, Carte administered the one-leg stand test and the walk and turn test. T. 114. While Carte was giving Miller instructions, Miller began to limp. State's exhibit 1. On the one-leg stand test Carte observed three of four clues including Miller hopping, swaying, and failing to keep his hands at his sides as directed. 120-121. On the walk and turn test, Carte observed six

of eight clues including Miller failing to take the required number of steps, stopping while walking, failing to walk heel to toe, hopping and losing his balance on the turn, stepping off the line, failing to keep his arms at his sides and raising his arms. All of which seemed inconsistent with his later claim that his back and shoulders hurt. T. 117-119. Miller's attitude during the testing was agitated and annoyed. State's exhibit 1.

{¶ 8}   Based on the totality of these clues, Carte placed Miller under arrest. Up until the walk-and-turn test, Miller had been standing and walking normally. While being placed under arrest, however, Miller began to limp even worse and hold his back. When cuffed behind his back Miller complained of pain in his shoulders, arms and back. He was therefore cuffed in the front. State's exhibit 1. Miller had receipts in his pockets from the bars he stated he had visited. His report of how much he drank was inconsistent with the receipts. Miller stated he bought drinks for others. When troopers began searching his car incident to towing, Miller became very agitated. He later refused to take a breath test. T. 124-128.

{¶ 9}   Miller was cited for operating a vehicle under the influence of alcohol (OVI) and a stop sign violation. He entered pleas of not guilty and elected to proceed to a jury trial on the OVI which took place on February 15, 2024. Miller elected to simultaneously try the stop sign violation to the court.

{¶ 10} The state presented the testimony of Sergeant Carte who provided the above outlined facts. Miller testified on his own behalf and presented the testimony of his father. After hearing the evidence and deliberating, the jury found Miller guilty of OVI and the trial court found him guilty of the stop sign violation.

{¶ 11} Miller filed an appeal and the matter is now before this court for consideration. He raises two assignments of error as follow:

I

{¶ 12} "WAS THE CONVICTION OF OPERATING A VEHICLE WHILE IMPAIRED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND A VIOLATION OF DUE PROCESS?"

II

{¶ 13} "WAS THE EVIDENCE OF IMPAIRMENT INADEQUATE AND THEREFORE INSUFFICIENT EVIDENCE?"

I, II

{¶ 14} Because they are interrelated, we elect to address Miller's assignments of error together. In his two assignments of error, Miller argues his conviction for OVI is against the manifest weight and sufficiency of the evidence. We disagree.

Applicable Law

{¶ 15} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks*, 61 Ohio St.3d 259 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307 (1979). On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and

determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  See also, *State v. Thompkins*, 78 Ohio St.3d 380 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."  *Martin* at 175.

## Miller's Arguments

{¶ 16} Miller was convicted of one count of OVI pursuant to R.C. 4511.19(A)(1)(a). That section provides no person shall operate any vehicle under the influence of alcohol, a drug of abuse, or a combination of them.

{¶ 17} Miller first argues that because Carte testified he patrols proactively instead of reactively, this demonstrates a "predisposition to identify impaired drivers." Appellant's brief at 5. In the same vein, Miller argues Carte's observation of the stop sign violation is not a valid indicator of impairment and "undermines the reasonableness of the initial traffic stop and subsequent observations." Appellant's brief at 16.

{¶ 18} We first note that Miller did not file a motion to suppress the traffic stop. "A failure to timely file a motion to suppress evidence amounts to a waiver of any such issues for purposes of trial pursuant to Crim.R. 12(D) and (H)." *State v. Bryson*, 2017-Ohio-830, ¶ 10 (5th Dist.) citing *State v. Montgomery*, 2008-Ohio-6077, ¶ 43 (5th Dist.), and *State v. Wade*, 53 Ohio St.2d 182 (1978), vacated and remanded on other grounds, 438 U.S. 911 (1978).  We will not therefore consider the "reasonableness of the stop."  Second, any alleged bias on the part of Carte for patrolling proactively was a credibility determination for the jury to determine. In any event, during his own testimony Miller

conceded he committed a stop sign violation, though he framed it as not being in the intersection "by civilian terms" but rather only "by the terms that the prosecution or the trooper has [sic] stated." T. 200-201, 215.

{¶ 19} Miller next argues the odor of alcohol on his breath was reasonably attributable to the two beers and one bourbon he consumed. While potentially accurate, the strong odor of alcohol was but one factor taken into consideration by Sergeant Carte in determining Miller was impaired. Moreover, the jury also learned that Miller did not tell Carte the truth about how much alcohol he had consumed the evening in question. First, the receipts found in his pockets were inconsistent with Miller's consumption report at the scene that he had "two beers." State's exhibit 1. Second, Miller's own testimony at trial contradicted his report at the scene. At trial he testified he had two beers and a shot and a half of bourbon. T. 124, 198-199.

{¶ 20} Miller next argues that according to the National Highway Traffic Safety Administration (NHTSA) manual, given his neck and back injuries, Sergeant Carte should not have administered the one-leg stand and walk-and-turn tests. He further argues he and his father provided detailed explanations of his medical limitations which allegedly account for Miller's difficulty in performing the field sobriety tests.

{¶ 21} First, the NHTSA manual was not admitted into evidence and is therefore not part of the record before this court. Second, as to Miller's alleged injuries or disabilities, the only testimony presented at trial to support these claims was Miller's own self-serving testimony and that of his father who listed Miller's physical disabilities as problems with disks in his neck and back, large bones in his mouth which makes his speech unclear at times, a lump on his foot, and a repaired orbital bone that was broken

in a fight. T. 183-186. Miller did not present testimony from any medical provider to confirm these claims nor to explain how they might interfere with the performance of field sobriety tests. Moreover, Miller put his own credibility at issue by testifying that he had engaged in manual labor – helping his parents with yardwork – prior to going out for the night to "blow off some steam" because his divorce has been "very, very crazy." T. 196. Finally, the jury viewed the body camera and dash camera videos and could judge Miller's performance for itself. State's exhibit 1.

{¶ 22} Miller next argues he performed poorly on the HGN test because he takes Adderall. First, Miller did not make this claim until trial. Despite being asked at the scene if he was taking any medications, Miller denied the same. At trial he conceded he did not tell Sergeant Carte he was taking Adderall. T. 217. Asked why Miller stated "The same reason we have HIPA[A] laws. What business is it of his?" T. 220. Finally, as with his alleged injuries, the jury had only Miller's self-serving claim to rely upon as Miller presented no evidence from a medical provider to confirm he is prescribed Adderall.

{¶ 23} Miller next argues Sergeant Carte decided to arrest him after the HGN test and before he finished field sobriety testing which "suggests a premeditated agenda to arrest Miller regardless of evidence." Appellant's brief at 9, 17. He further appears to argue Sergeant Carte's request to a backup trooper at the scene for nitrile gloves confirms this "premeditated agenda." But Carte testified he did not decide to arrest Miller until after completing the battery of field sobriety testing, and only requested the gloves in case he decided to arrest Miller and because he was out of gloves. T. 165-166. The jury was free to accept or reject Miller's suggestion that he was a victim of overzealous policing. The

jury's rejection of Miller's theory does not render his conviction against the manifest weight or sufficiency of the evidence.

{¶ 24} Miller's final argument attacks the pass/fail nature of field sobriety testing. He argues his "genuine desire to comply and give his best effort highlights the fundamental flaw in the SFST system." Appellant's brief at 18. However, Sergeant Carte testified the tests are not pass/fail. Rather, they are designed to provide clues of impairment to evaluate the totality of the interaction. T. 155. Moreover, Miller's alleged desire to give his best effort is belied by the videos of the stop and his refusal to submit to breath testing.

### Miller's Conviction is Supported by Sufficient, Credible Evidence

{¶ 25} Having addressed Miller's individual complaints, we turn to the evidence presented at trial. As outlined in our statement of facts, Sergeant Carte testified he made a traffic stop when Miller failed to stop behind the stop bar at a stop sign and instead stopped beyond the stop bar, on the crosswalk, and well into the intersection. Miller then failed to signal for a left-hand turn. Once Carte activated his overhead lights, Miller failed to pull over for 23 seconds despite numerous opportunities to do so sooner. When he did stop, he brought his Lexus to a jerking halt.

{¶ 26} Upon making contact with Miller, Carte detected a strong odor of alcohol coming from Miller, noted his eyes were bloodshot and glassy, that he took a good deal of time to find proof of insurance on his phone, and handed Carte two pieces of paper along with his identification. Based on these observations Carte proceeded with field sobriety testing. Miller performed poorly on all three tests. His attitude was poor throughout, insisting he had done nothing wrong. Miller had the opportunity to prove he

was not intoxicated in spite of his poor performance on field sobriety testing, but refused to provide a breath test. The jury was instructed that it could consider this fact in deciding whether Miller was under the influence of alcohol. T. 240.

{¶ 27} While Miller seems to argue that any one clue noted by the trooper, standing alone, is insufficient to support an OVI conviction, the jury was not presented with just one clue, but rather a multitude of clues indicating Miller was intoxicated. Based on the forgoing, the state produced sufficient evidence to support Miller's conviction for OVI.

{¶ 28} As to manifest weight, trial in this matter amounted to a determination of Sergeant Carte's credibility vis-a-vis Miller. And Miller did himself no favors by taking the stand. Even on a cold transcript Miller comes across as disdainful and petulant. For example, he referred to Sergeant Carte's routine questioning as a "grand inquisition" and further complained of the inconvenience of being pulled over:

> I am literally heading home to go to bed because I am freaking tired because I had been up since eight in the morning and I am on my way home, I am tired, and I just want to get home and then I am getting stopped grand acquisition [sic] and the whole time I am still in my mind processing everything that blew up in my marriage and things I am having to deal with in the legal system there so in this kind of one moment of peace of a quiet drive on the way home all of a sudden it became a you are not going home yet and now we are going to ask you about where you been and what you were doing, tell me all your medical history, what medications are you on, is there

anybody else in the car, I mean the desire to search the vehicle, it just felt it was very like hostile.

. . .

Again, my divorce is insane. I literally have two attorneys and in their thirty-five years combined experience say they have never seen anything like this, ever. I get pretty much going through this whole process if I am lucky four hours of sleep at night because often I would wake up with nightmares and so you take that and add that to my actual ADA recognized physical disabilities and then you add in the fact that I was up doing work in the A.M. I was freaking tired. I was heading home.

{¶ 29} T. 199-200.

{¶ 30} Asked by his counsel why he became quiet after his arrest Miller stated he felt he was "getting steamrolled and all that I have tried to do is cooperate, provide the information and be forthcoming, and it wasn't changing the outcome and so I knew at that point I was like I have to get an attorney." T. 211.

{¶ 31} The jury was presented with a decision to believe Miller's suggestion that he was a victim of biased and unjust policing and his apparent solicitation for sympathy because he was going through a divorce, or Sergeant Carte's testimony about a routine traffic stop and the video evidence of the same. Upon review of the entire record, we find the jury did not lose its way in believing the state's evidence over Miller's and in properly rejecting Miller's ploy for sympathy as directed by the trial court's instructions. T. 242.

{¶ 32}  Miller's two assignments of error are overruled.

{¶ 33}  The judgment of the Licking County Municipal Court is affirmed.


By King, J.,

Gwin, P.J. and

Wise, J. concur.